IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HBCU PRO FOOTBALL, LLC

    Plaintiff,

v.

                                           Case No. WDQ-10-0467

NEW VISION SPORTS
PROPERTIES, LLC, et al.

    Defendant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## REPORT AND RECOMMENDATION

The above-referenced case was referred to the undersigned for review of plaintiff's motion for default judgment and to make recommendations concerning damages, pursuant to 28 U.S.C. § 301 and Local Rule 301.6. (ECF No. 34.) Currently pending is Plaintiff's Motion for Default Judgment Against Defendants New Vision Sports Properties, LLC and Victor Pelt and Request for Hearing to Determine Damages. (ECF No. 33.) In accordance with Federal Rule of Civil Procedure 55(b)(2), an evidentiary hearing was held on Thursday, March 31, 2011. Plaintiff was represented at the hearing by E. David Hoskins, Esquire.[1] HBCU Pro Football, LLC ("HBCU") President and CEO Ronald E. Richardson presented testimony at the hearing. For the reasons discussed herein, I respectfully recommend that plaintiff's motion (ECF No. 33) be GRANTED and that damages be awarded as set forth herein.

---

[1] Neither Victor Pelt ("Pelt"), nor a representative from New Vision Sports Properties, LLC ("NVSP"), appeared at the March 31, 2011 hearing. On February 11, 2011, the undersigned issued a letter Order scheduling a hearing on the matter and directing plaintiff to send a certified copy of the letter to Victor Pelt and NVSP's last known addresses. (ECF No. 35.) At the hearing, plaintiff's counsel explained his repeated efforts to mail a copy of the Order, by certified and first class mail, to each of Pelt and NVSP's last known addresses, but all of the letters were returned unclaimed.

I. **BACKGROUND**

HBCU is a Maryland limited liability company that produces television broadcasts of college athletic contests involving historically black colleges and universities. (Compl., ECF No. 2 ¶¶ 1, 11; Pl.'s Mem., ECF No. 36 at 2.) Victor Pelt ("Pelt") is the owner of New Vision Sports Properties, LLC ("NVSP"), a California limited liability company, and was first introduced to HBCU in May of 2007. (ECF No. 2 ¶¶ 2, 14; ECF No. 36 at 2.) Pelt was characterized as "someone who had a track record of getting sporting events from historically black colleges and universities broadcast on CSTV, a national cable television network."[2] (ECF No. 2 ¶ 14; ECF No. 36 at 2.) Pelt represented himself to HBCU as an official broadcast agent of CSTV. (ECF No. 2 ¶ 15; ECF No. 36 at 2.)

In March, 2008, HBCU and Pelt met in Baltimore to negotiate an agreement for the broadcasting of three college football games during the fall 2008 season.[3] (ECF No. 2 ¶ 25; ECF No. 36 at 3-4.) On April 28, 2008, a written agreement (the "Agreement") was executed between HBCU and NVSP. (ECF No. 2 Ex. 1; ECF No. 36 Ex. 1.) The Agreement specifically identified NVSP as "an official broadcast agent of College Sports Television ("CSTV")." (Id.) Pursuant to the Agreement, HBCU agreed to provide recorded broadcasts of three college football games involving historically black colleges and universities, to which HBCU had secured the broadcasts rights. (ECF No. 2 ¶ 28; ECF No. 36 at 4.) These games included: (1)

---

[2] CSTV is a Delaware corporation based in New York, NY that does business as CBS College Sports Network ("CBSC"). (Compl., ECF No. 2 ¶ 3.)

[3] Pelt had earlier proposed to HBCU a plan for the broadcasting of football games on CSTV during the fall 2007 season, but no agreement was ever reached. (Pl.'s Mem., ECF No. 36 at 2.) As part of these negotiations, Pelt provided HBCU with a tentative schedule of games and represented to HBCU that it could average $250,000 from each sponsor. (Id.) Pelt also gave HBCU a list of all of the CSTV affiliates demonstrating that the network reached 60,000,000 households. (Id.)

2

Howard University v. Georgetown University on September 6, 2008 in Washington, DC; (2) Morgan State University v. North Carolina Central University on September 13, 2008 in Baltimore, MD; and (3) Florida A&M University v. Morgan State University on November 1, 2008 in Tallahassee, FL. (Id.) The November 1, 2008 game was later substituted for a November 8, 2008 game between Benedict College and Clark Atlanta University that took place in Atlanta, GA, after HBCU was unable to obtain broadcast rights for the November 1st game. (Id.) Pelt represented that he owned the broadcast rights to the November 8th game and agreed to transfer them to HBCU. (Id.)

In addition to providing recorded broadcasts of the three football games, HBCU agreed to pay NVSP a $50,000 broadcast fee for each game. (ECF No. 2 Ex. 1; ECF No. 36 Ex. 1.) In return, NSVP pledged to broadcast the games on CSTV's national television network and via online streaming on CSTV's website. (ECF No. 2 ¶ 27; ECF No. 36 at 4.) The Agreement further provided that NVSP would "secure on-campus, on-site and air advertising sales prior to each broadcast" and "guarantee[d] HBCU a minimum gross revenue payment of $400,000 per game." (ECF No. 2 Ex. 1; ECF No. 36 Ex. 1.) In August, 2008, the parties executed an addendum to the Agreement, confirming that HBCU would transfer all broadcast rights it obtained to NVSP. (ECF No. 2 Ex. 2; ECF No. 36 Ex. 2.)

HBCU provided recorded broadcasts to NVSP for each of the three games. (ECF No. 2 ¶ 33; ECF No. 36 at 5.) HBCU also paid NVSP a $50,000 broadcast fee for each game, for a total of $150,000.$^4$ (ECF No. 2 ¶ 34; ECF No. 36 at 5 Ex. 3.) HBCU received no payment from

---

$^4$ The parties agreed that $40,000 of the $150,000 total would be paid by HBCU directly to the Monumental City Bar Foundation ("MCBF"). (ECF No. 36 at 3, 5 Ex. 3.) This payment satisfied an existing obligation Pelt and NVSP owed MCBF in connection with the airing of a documentary about African American lawyers on CSTV in February, 2008. (Id.)

3

NSVP of any broadcasting revenues, and none of the games aired on CSTV.[5] (ECF No. 2 ¶ 36; ECF No. 36 at 7 Ex. 6.)

HBCU also alleges that it entered into an oral agreement with NSVP to air three additional college football games on the regional Mid-Atlantic Sports Network ("MASN"), pursuant to which NSVP promised HBCU a minimum payment of $100,000 per game.[6] (ECF No. 36 at 9.) Mr. Richardson testified that HBCU incurred additional production costs associated with these games but anticipated a $40,000 net profit for each game. While these games did air on MASN, NVSP failed to remit payment to HBCU of any broadcasting revenues

---

[5] When HBCU requested that Floyd Kerr, Athletic Director at Morgan State University, confirm with Pelt that the September 13th game between Morgan State and North Carolina Central University had aired on CSTV, Pelt responded with a text message stating that the game aired at 9:00 a.m. on September 19, 2008 and again at 10:00 p.m. on September 20, 2008. (ECF No. 2 ¶ 45; ECF No. 36 at 6-7.) The message also stated that the game received a .03 rating, indicating a viewership of approximately 30,000 households. (Id.)

In addition, while Pelt informed HBCU in November, 2008 that the third game did not air on CSTV, Pelt went on to state that his discussions with the sponsors and CSTV went well and assured HBCU that it would still be paid $800,000 for the first two games. (ECF No. 2 ¶ 48; ECF No. 36 at 6.) Pelt purportedly "bragged about how good of a talker he was and that the sponsors did not care what games their commercials aired on because they knew nothing about the historically black colleges and university schools involved" and "were only interested in having their commercials aired on CSTV." (Id.) Mr. Richardson testified at the hearing that these representations led him to believe that the games had actually aired on CSTV.

[6] Mr. Richardson testified at the hearing that he and Pelt had ongoing discussions about the possibility of broadcasting additional inter-conference games on MASN. As a result of these discussions, he and Pelt drafted an addendum memorializing the terms of their oral agreement, but it was never executed. Mr. Richardson further testified that NVSP entered into contracts with various sponsors to air commercials during the MASN broadcasts, from which Pelt and NVSP received advertising revenues.

While the oral contract was not specifically addressed in HBCU's Complaint, HBCU did reference it when it alleged that it "archived all six games it produced." (ECF No. 36 ¶ 47.) Moreover, counsel for HBCU explained at the hearing that the amount of damages HBCU requested in its Complaint for breach of contract, $1,500,000, was calculated based on the $400,000 in broadcasting revenues NVSP promised HBCU for each of the three games subject to the written Agreement ($1,200,000), plus $100,000 for each of the three additional games broadcast on MASN ($300,000). (Id. ¶ 56.)

4

associated with these games.  (Id. at 5.)

HBCU obtained loans from various banks to finance its obligations under its contracts with NVSP.  (ECF No. 2 ¶ 39; ECF No. 36 at 5.)  Upon request from one such bank, Harbor Bank, Pelt provided a letter confirming the existence of the contractual relationship between HBCU and NVSP on CSTV letterhead.  (ECF No. 2 ¶ 39; ECF No. 36 at 5 Ex. 4.)

On March 4, 2009, Mallory Levitt, CBS's Vice President and Assistant General Counsel for Intellectual Property, sent a letter to Pelt stating that CBS had recently become aware that Pelt has been "making false representations" that he and NVSP are official broadcast agents for CBS College Sports Network ("CBSC").  (ECF No. 36 at 6 Ex. 5)  Specifically, the letter stated that "we are seriously concerned with your false representations as such use constitutes an improper association which trades on the good will and reputation of CBS and CBSC and will likely cause, and has already caused, third parties to mistakenly believe that you and your company are affiliated with CBS and CBSC when there is no such affiliation."  (Id.)

In a letter dated March 4, 2009, Catherine A. Lindsey, Executive Vice President for Business Affairs and General Counsel for CBSC informed an attorney for HBCU, Martin King, that NVSP "is not currently, nor was it at any time in 2008, an official broadcast agent of CSTV . . . and has no authority to bind CBSC in any manner."  (ECF No. 36 at 6-7 Ex. 6.)  Ms. Lindsey further stated that "CBSC never agreed to air, never intended to air and never aired any of the HBCU programming . . . on its television network or via online streaming."[7]  (Id.)

On January 13, 2010, HBCU filed the instant suit against NVSP, CSTV, and Pelt in the Circuit Court for Baltimore City, alleging breach of contract, intentional misrepresentation, and

---

[7] Mr. Richardson testified at the March 31, 2011 hearing this letter was the first time HBCU became aware of CSTV's position that NVSP was not, and had never been, an official broadcast agent of CSTV.

5

unjust enrichment. (ECF No. 2.) On February 26, 2010, CSTV removed the case to this Court on the basis of diversity, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (Notice of Removal, ECF No. 1.) HBCU served NVSP and Pelt with a Summons and Complaint on March 3, 2010. (Hoskins Affs., ECF Nos. 9 & 10.) After both NSVP and Pelt failed to file an Answer or otherwise defend, HBCU filed a motion for default judgment against NVSP and Pelt on July 20, 2010, and the Clerk of the Court entered an Order of Default on July 22, 2010. (ECF Nos. 18 & 19.)

HBCU reached a settlement agreement with CSTV, and the case was dismissed, pursuant to Local Rule 111, on December 14, 2010. (ECF No. 29.) Judge Quarles thereafter granted HBCU's unopposed motion to re-open the case for the limited purpose of perfecting a default judgment against NVSP and Pelt. (ECF No. 32.) HBCU filed a Motion for Default Judgment Against Defendants New Vision Sports Properties, LLC and Victor Pelt and Request for Hearing to Determine Damages on January 18, 2011, which Judge Quarles has referred to the undersigned to review and to make recommendations concerning damages. (ECF No. 33 & 34.)

## II. STANDARD FOR ENTRY OF DEFAULT JUDGMENT

In reviewing a motion for default judgment, the court accepts as true the well-pleaded factual allegations in the complaint as to liability. Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780-81 (4th Cir. 2001). It, however, remains for the court to determine whether these unchallenged factual allegations constitute a legitimate cause of action. Id.; see also 10A Wright, Miller & Kane, Federal Practice and Procedure § 2688 (3d ed. Supp. 2010) ("[L]iability is not deemed established simply because of the default . . . and the court, in its discretion, may require some proof of the facts that must be established in order to determine liability.").

If the court determines that liability is established, the court must then determine the

appropriate amount of damages. Ryan, 253 F.3d at 780-81. The court does not accept factual allegations regarding damages as true, but rather must make an independent determination regarding such allegations. E.g., Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 154 (2d Cir. 1999). In so doing, the court may conduct an evidentiary hearing. Fed. R. Civ. P. 55(b)(2).

In sum, the court must (1) determine whether the unchallenged facts in HBCU's Complaint constitute a legitimate cause of action, and, if they do, (2) make an independent determination regarding the appropriate amount of damages.

### III. DISCUSSION

#### a. NVSP's Liability for Breach of Contract

HBCU's Complaint pleads a cause of action for breach of contract against NVSP. (ECF No. 2 ¶¶ 49-56.) As a preliminary matter, the undersigned notes that federal courts sitting in diversity look to the choice of law rules of the state in which they sit to determine which substantive law to apply. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). In contract actions, Maryland courts ordinarily apply the principle of lex loci contractus, under which the law of the jurisdiction where the contract was made governs its validity and construction. Kramer v. Bally's Park Place, Inc., 311 Md. 387, 390, 535 A.2d 466, 467 (1988). A contract is made where the "last act necessary" to form the contract occurred. Rouse Co. v. Fed. Ins. Co., 991 F. Supp. 460, 462 (D. Md. 1998). Maryland courts have long acknowledged, however, "the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied by the court." Jackson v. Pasadena Receivables, Inc., 398 Md. 611, 921 A.2d 799, 803 (2007) (citing

7

Williams v. N.Y. Life Ins. Co., 122 Md. 141, 89 A. 97, 99 (1913)).  In the instant case, the written Agreement between HBCU and NVSP expressly states that it is "governed and subject to the laws and provisions of the state of California."  (ECF No. 2 Ex. 1; ECF No. 36 Ex. 1.)  Accordingly, California law will apply to the written Agreement.

In order to assert a prima facie cause of action for breach of contract under California law, a plaintiff must establish "(1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach."  CDF Firefighters v. Maldonado, 70 Cal. Rptr. 3d 667, 679 (Cal. Ct. App. 2008).  The elements necessary to form a valid contract are:  (1) parties capable of contracting; (2) mutual consent; (3) a lawful object; and (4) sufficient consideration.  Cal. Civ. Code § 1550.

Accepting as true the well-pleaded allegations of fact as set forth in HBCU's Complaint (ECF No. 2), and as supplemented in plaintiff's memorandum (ECF No. 36) and supporting exhibits and by testimony received at the March 31, 2011 hearing, the undersigned concludes that these allegations constitute a legitimate cause of action for breach of contract against NVSP.  The written Agreement signed by HBCU and NVSP has all the essential elements of a valid and enforceable contract.  (ECF No 2 Ex. 1; ECF No. 36 Ex. 1.)  HBCU complied with its obligations under the Agreement by producing and providing to NVSP recorded broadcasts of the three college football games for display on CSTV's television network and website.  (ECF No. 2 ¶ 33; ECF No. 36 at 5.)  NVSP breached the Agreement by failing to remit payment to HBCU of any broadcasting revenues, and HBCU was damaged thereby, as it did not receive the benefit of NVSP's promised performance.  (ECF No. 2 ¶ 36; ECF No. 36 at 5.)

As for the oral contract at issue, counsel for HBCU conceded at the hearing that it is unclear where the "last act necessary" to create the oral contract took place.  The oral agreement

to broadcast three additional games on MASN arose out of a telephone conversation between Mr. Richardson, who was in Maryland, and Pelt, who was either in Florida or California. Regardless of whether it was made in California, Maryland, or Florida, the undersigned concludes that HBCU has established NVSP's liability for breach of the oral contract. All three states recognize the validity of oral contracts, subject to limited statutory exceptions, none of which are present here. See Peoples Drug Stores v. Fenton Realty Corp., 191 Md. 489, 493-94, 62 A.2d 273, 275 (1948); Barroso v. Respiratory Care Servs., Inc., 518 So. 2d 373, 376 (Fla. Dist. Ct. App. 1987); Cal. Civ. Code § 1622. Moreover, the states do not differ materially in their general requirements for establishing liability for breach of contract.[8] Accordingly, accepting as true HBCU's well-pleaded allegations of fact, the undersigned finds that HBCU has demonstrated that it had a valid and enforceable oral contract with NVSP. There was mutual assent between HBCU and NVSP, the terms of the agreement were sufficiently definite, and the agreement was supported by consideration—HBCU agreed to produce and provide recorded broadcasts of the three games to NVSP in exchange for NVSP's promise to pay HBCU $100,000 in broadcasting revenues for each game. (Id. at 9.) HBCU has further demonstrated that NVSP breached its obligation when it failed to remit payment to HBCU of any broadcasting revenues

---

[8] In order to assert a cause of action for breach of contract under Maryland law, a plaintiff must prove: (1) the existence of a contractual obligation owed, and (2) a breach of that obligation. Taylor v. NationsBank, N.A., 365 Md. 166, 776 A.2d 645, 651 (2001). A contract exists under Maryland law where there is "mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." CTI/DC, Inc. v. Selective Ins. Co. of Am., 392 F.3d 114, 123 (4th Cir. 2004) (citing Peer v. First Fed. Sav. and Loan Ass'n of Cumberland, 273 Md. 610, 331 A.2d 299, 301 (1975)).

Similarly, a breach of contract under Florida law requires proof of (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." AVVA–BC, LLC v. Amiel, 25 So. 3d 7, 12 n. 3 (Fla. Dist. Ct. App. 2009) (citations omitted). For an oral contract to be valid, plaintiff must allege "offer, acceptance, consideration, and sufficient specification of the essential terms." St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004).

from the three additional games.  (Id. at 5.)

   b. **Damages for Breach of Contract**

Having concluded that HBCU's well-pleaded allegations of fact support a finding that NVSP is liable for breach of contract, HBCU is entitled to damages.   Addressing first the parties' written Agreement, HBCU requests $400,000 in broadcasting revenues owed by NVSP for each of the three games.  (ECF No. 36 at 9.)  This request is supported by the compensation terms outlined in the Agreement, which clearly state that "NVSP guarantees HBCU a minimum gross revenue payment of $400,000 per game" and by the other exhibits and testimony referencing the three-game package.  (Id. Ex. 1, Ex. 3.)

Damages for a breach of contract under California law are governed by California Civil Code § 3300, which provides that a plaintiff may recover that "amount which will compensate the party aggrieved for all detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  "The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised."  Brandon & Tibbs v. George Kevorkian Accountancy Corp., 277 Cal. Rptr. 40, 47 (Cal. Ct. App. 1990). Where, as here, the breach of contract is a failure to pay money, California Civil Code § 3302 authorizes recovery of the amount due under the terms of the contract, plus interest.  HBCU is therefore entitled to recover the $400,000 in broadcasting revenues due for each of the three games covered by the Agreement, plus 10% per annum prejudgment interest, accruing from the date of each breach, for a total of $1,507,838.31.[9]  Cal. Civ. Code §§ 3289(b).  The relevant period for calculating interest is the date each revenue payment became due for each game (30 days after each broadcast) through the date of this Report, as calculated below.  For each day

---

[9] The undersigned accepts the daily interest rate calculation proffered by HBCU of $109.59.  (ECF No. 36 at 9.)

10

thereafter until judgment is entered, the undersigned recommends that $328.77 in prejudgment interest[10] should accrue.[11]

| Date of Game | Date of Breach | Payment Due | Days Since Breach | Per Diem Rate of 10% Interest | Interest Due | Total Damages |
|---|---|---|---|---|---|---|
| 9/7/2008 | 10/7/2008 | $400,000 | 959 | $109.59 | $105,096.81 | $505,096.81 |
| 9/13/2008 | 10/13/2008 | $400,000 | 953 | $109.59 | $104,439.27 | $504,439.27 |
| 11/8/2008 | 12/8/2008 | $400,000 | 897 | $109.59 | $98,302.23 | $498,302.23 |

Turning to the oral agreement, California law differs from Maryland law as to the amount of prejudgment interest awarded in breach of contract actions.[12] "The rate of prejudgment interest is a matter of damages. . . . [D]amages are considered to be a substantive matter" for choice of law purposes. Marine Midland Bank v. Kilbane, 573 F. Supp. 469, 471 (D. Md. 1983) aff'd 739 F.2d 958 (4th Cir. 1984) (citing Polylage v. Greyhound Lines, Inc. 401 F. Supp. 335, 337 (D. Md. 1975)). Accordingly, the undersigned will address this conflict to determine which state's substantive law to apply.

Even assuming the oral contract was made in California, Maryland law should apply under the limited renvoi exception to lex loci contractus adopted by the Maryland Court of Appeals in Am. Motorists Ins. Co. v. ARTRA Group, Inc., 338 Md. 560, 659 A.2d 1295 (1995).

---

[10] $109.59 x 3 = $328.77.

[11] The undersigned recommends that the district court calculate the damages award for breach of the written contract as follows: $1,507,838.31 + [$328.77 x number of days from date of this Report to date judgment is entered].

[12] The rate of prejudgment interest allowable in breach of contract actions is the same in Maryland and Florida. See Fed. Sav. & Loan Ins. Corp. v. Quality Inns, Inc., 876 F.2d 353, 359 (4th Cir. 1989) (recognizing that the legal rate of interest in Maryland is 6%); http://www.myfloridacfo.com/aadir/interest.htm (pursuant to Fl. Stat. § 55.03(1), the statutory rate of interest for 2011 is 6% per annum). Since there is no conflict between Florida and Maryland law in the amount of damages HBCU may recover for breach of the oral contract, the court need not address whether Florida law should apply.

11

There, the court held that "Maryland courts should apply Maryland substantive law to contracts entered into in foreign states' jurisdictions in spite of the doctrine of lex loci contractus when: (1) Maryland has the most significant relationship, or, at least, a substantial relationship with respect to the contract issue presented; and (2) [t]he state where the contract was entered into would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court." Id. at 579, 1304. Here, Maryland has a substantial relationship to the contract issue presented, as it involves a Maryland plaintiff and a company transacting business in Maryland, Maryland is the forum state, and HBCU suffered pecuniary harm in Maryland as a result of NVSP's breach. Moreover, California would apply Maryland law under its three-step "governmental interest" approach to resolving conflict of laws issues.[13] Wash. Mut. Bank v. Superior Court, FA, 15 P.3d 1071, 1080-81 (Cal. 2001). Maryland has a more compelling interest in applying its law governing prejudgment interest in a suit brought by a Maryland plaintiff in a Maryland forum against a corporate entity doing business in Maryland, as the Maryland law providing for the allowance of prejudgment interest is designed "to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." I. W. Berman Props. v. Porter Bros., Inc., 276 Md. 1, 24, 344 A.2d 65, 79 (1975); see also Robert McMullan & Son, Inc. v. United States Fid. and Guar. Co., 162 Cal. Rptr. 720 (Cal. Ct. App. 1980) (applying governmental interest analysis to conclude that California law governs award of attorney fees in suit brought by California plaintiff in

---

[13] Under this approach, the court must first "identify the applicable rule of law in each potentially concerned state and [ ] show it materially differs from the law of California." Wash. Mut. Bank v. Superior Court, 15 P.3d 1071, 1080 (Cal. 2001). If the laws are materially different, the court must then "determine what interest, if any, each state has in having its own law applied to the case." Id. If the state with the materially different law has an interest in the application of its law, the court must proceed to the final step and "select the law of the state whose interests would be 'more impaired' if its law were not applied." Id. at 1081 (internal quotations omitted).

California forum against out-of-state insurer doing business in California). Accordingly, Maryland law will apply to the oral contract at issue.

HBCU requests $100,000 in broadcasting revenues owed for each game covered under the oral contract, plus prejudgment interest. (ECF No. 36 at 9.) This request is supported by Mr. Richardson's testimony that the parties entered into an oral contract providing that NVSP would pay HBCU an additional $100,000 for each of the three additional games broadcast on MASN. (Id.)

Under Maryland law, "the amount of damages recoverable for breach of contract is that which will place the injured party in the monetary position he would have occupied if the contract had been properly performed." Hall v. Lovell Regency Homes Ltd. P'ship, 121 Md. App. 1, 12, 708 A.2d 344, 349 (1998). Maryland also authorizes an award of prejudgment interest in breach of contract actions for failure to pay a definite sum, running from the date payment became due. I. W. Berman Props. v. Porter Bros., 276 Md. 1, 18, 344 A.2d 65, 75-76 (1975) ("If the contractual obligation be unilateral and is to pay a liquidated sum of money at a certain time, interest is almost universally allowed from the time when its payment was due.") The legal rate of interest in Maryland is six percent. Md. Const. art. III, § 57; Fed. Sav. & Loan Ins. Corp. v. Quality Inns, Inc., 876 F.2d 353, 359 (4th Cir. 1989).

Accordingly, HBCU is entitled to recover the $100,000 in broadcasting revenues due for each of the three games covered by the oral contract, plus 6% per annum prejudgment interest, running from the date of the breach, for a total of $345,505.92.[14] The relevant period for calculating interest is the date the $100,000 revenue payment became due for each game (30 days after each broadcast) through the date of this Report, as calculated below. For each day

---

[14] The undersigned accepts the daily interest rate calculation proffered by HBCU of $16.44. (Supplemental Briefing, ECF No. 37 at 2.)

13

thereafter until judgment is entered, $49.32[15] should accrue.[16]

| Date of Game | Date of Breach | Payment Due | Days Since Breach | Per Diem Rate of 6% Interest | Interest Due | Total Damages |
|---|---|---|---|---|---|---|
| 9/20/2008 | 10/20/2008 | $100,000 | 946 | $16.44 | $15,552.24 | $115,552.24 |
| 10/18/2008 | 11/17/2008 | $100,000 | 918 | $16.44 | $15,091.92 | $115,091.92 |
| 11/1/2008 | 12/1/2008 | $100,000 | 904 | $16.44 | $14,861.76 | $114,861.76 |

### c. NVSP and Pelt's Liability for Intentional Misrepresentation

HBCU's Complaint pleads a cause of action for intentional misrepresentation against NVSP and Pelt. (ECF No. 2 ¶¶ 57-70.) In tort actions, Maryland follows the choice of law rule <u>lex loci deliciti</u>, meaning it applies the substantive law of the place where the wrong occurred. <u>Philip Morris Inc. v. Angeletti</u>, 358 Md. 689, 744, 752 A.2d 200, 230 (2000). In the instant case, the misrepresentations occurred in Maryland, so Maryland law will apply to HBCU's intentional misrepresentation claim. The parties' agreement arose out of discussions between Pelt and HBCU in Baltimore in March of 2008, "during which Victor Pelt gave a CSTV Presentation" and represented that he and his company, NVSP, were an official broadcast agent of CSTV. (Compl., ECF No. 2 ¶¶ 25-26; ECF No. 36 at 2-3.)

A cause of action for intentional misrepresentation under Maryland law requires proof of the following elements: "(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the

---

[15] $16.44 x 3 = $49.32.

[16] The undersigned recommends that the district court calculate the damages award for breach of the oral contract as follows: $345,505.92 + [$49.32 x number of days from date of this Report to date judgment is entered].

14

misrepresentation." Cent. Truck Ctr., Inc. v. Cent. GMC, Inc., 194 Md. App. 375, 388, 4 A.3d 515, 522 (2010) (internal citation omitted). A plaintiff must prove each of these elements by clear and convincing evidence. VF Corp. v. Wrexham Aviation Corp., 350 Md. 693, 704, 715 A.2d 188, 193 (1998).

Accepting as true HBCU's well-pleaded allegations of fact, the undersigned concludes that HBCU has established Pelt's and NVSP's liability for intentional misrepresentation. HBCU has demonstrated that, prior to the execution of their contracts, Pelt represented to HBCU that he was an official broadcast agent of CSTV. (ECF No. 2 ¶ 15; ECF No. 36 at 2, 10.) Moreover, the Agreement specifically identifies NVSP as "an official broadcast agent of College Sports Television ("CSTV")." (Id.) The falsity of these representations is evidenced in the March 4, 2009 letter to Pelt from Mallory Levitt as well as the March 4, 2009 letter from Catherine Lindsey to HBCU's attorney, Mark King. (Id. Exs. 5 & 6.) HBCU has alleged sufficient facts for the court to conclude that the misrepresentations were made for the purpose of defrauding HBCU and that HBCU justifiably relied on these representations in entering into a contractual partnership with NVSP. Finally, HBCU has demonstrated that it suffered damages as a result of these misrepresentations. (Id. at 10 (citing Exs. 3, 7, 8).)

### d. **Damages for Intentional Misrepresentation and Fraud**

In an action for intentional misrepresentation under Maryland law, a plaintiff may recover those damages that will put him "as nearly as practicable, in the position he would have been had he not been defrauded." Beardmore v. T. D. Burgess Co., 245 Md. 387, 390, 226 A.2d 329, 331 (1967). Consistent with this standard, HBCU requests $412,000 in damages for production costs it incurred in procuring the recorded broadcasts of the games. (ECF No. 36 at 10.) In support of this request, HBCU submitted invoices for production services from Riparian

Broadcasting, a Maryland company that produced the recorded broadcasts of the games for HBCU. (Id. Ex. 7.) The undersigned observed, and counsel for HBCU conceded at the hearing, that two of the invoices appear to be for production costs not associated with the parties' contracts.[17] (Id. Ex. 7, at 8-9.) Excluding these costs, the undersigned finds that HBCU is entitled to recover production costs in the amount of $381,800 against NVSP and Pelt, jointly and severally.

HBCU also requests $150,000 in broadcast fee payments it made to NVSP, pursuant to the written Agreement. (Id. at 10.) This request is supported by documentation of payments HBCU made to NVSP equaling this amount.[18] (Id. Ex. 3.) Recovery of these funds is appropriate to put HBCU, the injured party, in the position it would have been in had it not been defrauded. Accordingly, the undersigned recommends that HBCU be awarded damages for broadcast fee payments in the amount of $150,000 against NVSP and Pelt, jointly and severally.

Mr. Richardson testified at the hearing that HBCU entered into contracts with various colleges and universities to secure broadcast rights to the games, as a result of which HBCU incurred $80,000 in broadcast rights obligations owed to these colleges and universities. (Id. at 10.) In addition to Mr. Richardson's testimony, HBCU provided copies of broadcast rights contracts in support of this request. (Id. Ex. 8.) Recovery of this amount will compensate

---

[17] The undersigned also observed at the hearing that the first invoice submitted was for production costs associated with the August 30, 2008 Florida A&M v. Alabama State University football game, a game that did not appear to be covered by either of the parties' contracts. The undersigned accepts Mr. Richardson's testimony that this game was originally included but later dropped from the three-game package and that HBCU still incurred costs associated with the cancelled production in carrying out its obligations under the Agreement.

[18] As noted previously, the parties agreed, and the exhibit reflects, that HBCU would pay $40,000 directly to the Monumental City Bar Foundation ("MCBF") to satisfy an existing obligation Pelt and NVSP owed MCBF in connection with the airing of a documentary film on CSTV. (ECF No. 36 at 3, 5 Ex. 3.)

16

HBCU for losses it incurred as a result of the fraud, and accordingly, the undersigned recommends that HBCU be awarded $80,000 in damages for broadcast rights obligations against NVSP and Pelt, jointly and severally.

HBCU also requests punitive damages for its intentional misrepresentation claim against Pelt. (ECF No. 2; ECF No. 36 at 13.) Punitive damages may only be recovered in tort actions in Maryland. Bowden v. Caldor, Inc., 350 Md. 4, 22, 710 A.2d 267, 276 (1998). The purpose of an award of punitive damages is "to punish the defendant for egregiously bad conduct toward the plaintiff, [and] also to deter the defendant and others contemplating similar behavior." Id. (quoting Owens-Corning v. Garrett, 343 Md. 500, 537-538, 682 A.2d 1143, 1161 (1996)). "Even where the evidence warrants punitive damages, it is within the sound discretion of the trier of fact to award or deny such damages." Philip Morris Inc. v. Angeletti, 358 Md. 689, 773-74, 752 A.2d 200, 246 (2000). Factors to be considered in determining the appropriate award of punitive damages include (1) "an amount that will deter the defendant and others from similar conduct," and is (2) "proportionate to the wrongfulness of the defendant's conduct and the defendant's ability to pay," but is (3) "not designed to bankrupt or financially destroy a defendant." Maryland Pattern Civil Jury Instruction 10:13 (4th ed. 2004).

In its hearing memorandum, HBCU requests $1,861,488.86 in punitive damages, an amount HBCU asserts "would effectively make Pelt personally responsible for the same amount of damages owed by NVSP for breach of contract." (ECF No. 36 at 13.) In assessing the appropriate amount of punitive damages, the undersigned finds the deterrence value the strongest factor weighing in support of an award of punitive damages against Pelt. In addition to evidence that Pelt falsely represented his relationship with CSTV, HBCU has introduced evidence that Pelt misappropriated CSTV trade secrets and letterhead. (ECF No. 36 Exs. 6, 7.) The

17

undersigned finds that a punitive damages award of $1,000,000 is proportionate to the wrongfulness of Pelt's conduct and would serve as a strong deterrent to others who might engage in similar conduct. Moreover, this amount is consistent with the amount of punitive damages HBCU requested in its Complaint, and Federal Rule of Civil Procedure 54(c) provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Finally, while HBCU conceded at the hearing that it did not present any evidence regarding Pelt's ability to pay,[19] the Maryland Court of Appeals has held that "a plaintiff has no obligation to establish a defendant's ability to pay punitive damages." Darcars Motors of Silver Spring, Inc. v. Borzym, 379 Md. 249, 275, 841 A.2d 828, 843 (2004). Accordingly, the undersigned recommends that HBCU's failure to introduce such evidence not affect the amount of punitive damages awarded, particularly where, as here, defendants have not appeared to defend themselves.

## IV. CONCLUSION

In sum, I recommend that:

1. The court GRANT plaintiff HBCU's Plaintiff's Motion for Default Judgment Against Defendants New Vision Sports Properties, LLC and Victor Pelt (ECF No. 33); and

2. The court award HBCU $1,507,838.31 for breach of the written Agreement against NVSP, plus $328.77 in prejudgment interest per day from the date of this Report until judgment is entered; and

3. The court award HBCU $345,505.92 for breach of the oral contract against NVSP, plus $49.32 in prejudgment interest per day from the date of this Report until judgment is entered; and

---

[19] Counsel for HBCU did point out that Pelt, as the sole owner of NVSP, received $110,000 from HBCU, pursuant to the Agreement.

4. The court award HBCU $611,800 for intentional misrepresentation, against NVSP and Pelt, jointly and severally; and

5. The court award HBCU $1,000,000 in punitive damages against Pelt.

    I also direct the Clerk to mail a copy of this Report and Recommendation to defendants New Vision Sports Properties, LLC and Victor Pelt at the addresses listed on plaintiff's Complaint (ECF No. 2).

    Any objections to this Report and Recommendation must be served and filed within fourteen (14) days, pursuant to Fed. R. Civ. P. 72(b) and Local Rule 301.5.b.


Date:  05/24/2011                              /s/
                                                                         Beth P. Gesner
                                                                        United States Magistrate Judge